Jerome E. Casey, Transferee of the Assets of Bankers Development Corporation v. Commissioner.Casey v. CommissionerDocket No. 59388.United States Tax CourtT.C. Memo 1957-226; 1957 Tax Ct. Memo LEXIS 23; 16 T.C.M. (CCH) 1024; T.C.M. (RIA) 57226; December 10, 1957*23 Held: 1. Bankers did not accumulate its earnings and profits beyond the reasonable needs of its business during the years ended April 30, 1948 and April 30, 1949, and that Bankers was not availed of for the purposes of avoiding the surtax upon its shareholders within the meaning of section 102, I.R.C. 1939. 2. Bankers accumulated its earnings and profits beyond the reasonable needs of its business during the year ended April 30, 1950 and was availed of for the purpose of preventing the imposition of surtax upon its shareholders and, accordingly, is liable for the surtax under section 102 for that year. Robert W. Brady, Esq., for the petitioner. William G. O'Neill, Esq., for the respondent. TIETJENSMemorandum Findings of Fact and Opinion TIETJENS, Judge: The Commissioner determined that the petitioner is liable as a transferee of the assets of the Bankers Development Corporation (hereinafter referred to as Bankers), for deficiencies in surtax under section 102 of the Internal Revenue Code of 1939 for the years ended April 30, 1948 through April 30, 1950, as follows: Year EndedSection 102 Surtax4-30-48$ 8,272.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,297.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,372.58 The only issue for decision is whether *24 Bankers was availed of during the taxable years for the purpose of preventing the imposition of surtax upon its shareholders through the medium of permitting earnings or profits to accumulate instead of being distributed within the meaning of section 102. Findings of Fact Some of the facts are stipulated. Such facts are found as stipulated and with the pertinent exhibits are included herein by reference. The petitioner is an individual residing at Sag Harbor, New York. It is stipulated that he is a transferee of the assets of Bankers and is liable for the deficiencies in income tax (Section 102 Surtax) which may be determined in this proceeding as being due and payable by Bankers for the taxable years ended April 30, 1948 through April 30, 1950. Bankers filed its income tax returns for those years with the then collector of internal revenue for the second district of New York. Bankers was organized in 1920. At that time it exchanged preferred and common stock with a par value of $26,589.60 and cash in the amount of $40.10 for certain new account solicitation contracts which had been made with banks throughout the country. Under the terms of the contracts, Bankers would be paid a certain *25 amount for each new account it secured for the banks. George Carhart was Bankers president and chief stockholder during the early years of its existence. Jerome Casey, the petitioner, was employed by Bankers in 1920 as a new account solicitor. In 1923 he became a manager of a crew of new account solicitors and in 1928 became the supervisor of new account solicitation contract operations. During the 1920's Bankers derived income from the promotion and sale of an audit system for banks. However, Bankers' major line of service until 1939 was conducting new account campaigns for banks, and such service produced most of Bankers' income during that period. During the 1930's economic conditions and changing banking practices cut the demand for Bankers' new account campaign services. In the early part of 1939 Bankers was in a precarious financial condition. Casey, who was supervising contract operations in the field found that Bankers was not able to supply him with the necessary materials for operating because its suppliers would no longer deliver to it on credit. Casey made an arrangement whereby he paid for the supplies himself, operated the contracts in the field, and reimbursed himself *26 out of collections made by his crew. Collections in excess of his advances were remitted to Bankers. In the early part of April 1939, Casey, along with George Pace, Bankers' only salesman of its new account solicitations contracts, went to Bankers' New York office to investigate its financial situation. Bankers' "Tentative Balance Sheet" dated March 31, 1939, showed that Bankers' bank account was overdrawn $1,574, that it had accounts receivable from customers of $855.68, and inventory of $5,758.66; also that it had current liabilities of $33,789.62, which included advances from Casey of $5,572.60. Bankers had an operating loss of $3,903.36 for the year ended April 30, 1939. At that date its surplus account showed a deficit of $41,487.02, which was principally due to writing off, or writing down, the value of certain assets. At the end of April 1939, Casey loaned Bankers $7,500 and several months later Casey and Clifford Owen, an attorney, purchased all of Bankers' stock from Carhart. About that time Casey became the president of Bankers. From that time until the year 1951, Casey and Owen each owned 50 per cent of Bankers' stock. The following schedule shows the number of personal *27 solicitation contracts in existence at the end of each of the years April 30, 1939 through April 30, 1950 and the gross profit earned by Bankers on the personal solicitation contracts during each of the years ended April 30, 1939 through April 30, 1950: Number ofYear EndedContractsGross Profit4-30-3910$17,236.274-30-401218,224.174-30-41611,134.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,527.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,999.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,922.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,883.904-30-462(1,402.95) **4-30-4728,159.854-30-48*3,975.564-30-49*8,001.544-30-50*6,791.42On its Balance Sheets for the years ended April 30, 1948 through April 30, 1950, Bankers listed "Unoperated Portion of Signed Contracts" as an asset with a value of $26,640.60. During the early 1930's banks began to impose service charges upon checking accounts in which the depositors' daily balance was insufficient to justify the banks' cost of operating the account. A demand arose for a system which would render checking account service to depositors without requiring a minimum balance, yet which would *28 pay the banks the cost of operating it and also be acceptable to the public. The first no minimum balance checking account plans used checks which were marked "Special Checking Account" and had account numbers on them, for purposes of identification. In 1937, the Empire Trust Company of New York (hereinafter referred to as Empire Trust) employed Bankers to make a survey regarding its method of operating no minimum balance checking accounts. Empire Trust had been using punch card checks, but they proved unsatisfactory in operation. About that time Bankers discovered a plan used by the Trust Company of North America (hereinafter referred to as The Trust Company) which met with the public's approval. The latter bank used checks with the individual's name printed on them. There were no other markings on the checks to show that they came from a no minimum balance checking account. Bankers began negotiations with The Trust Company with the idea of becoming its sales agent of the plan. However such negotiations were discontinued when The Trust Company investigated Bankers' financial position and found how weak it was at that time. Pace, meantime, had tried to interest some banks in the system *29 used by The Trust Company. The Granite Trust Company (hereinafter referred to as Granite Trust) of Quincy, Massachusetts was particularly interested and was ready to sign a contract with Bankers. Bankers therefore decided to duplicate the system used by The Trust Company. The main problem facing Bankers was finding a machine which would imprint the checks with the customer's name while the account was being opened. The Trust Company had never disclosed its method of imprinting the checks. Bankers learned of a machine furnished to stationery stores by a large paper manufacturer which enabled the stores to print the names and addresses of its customers on their stationery. The paper manufacturer had an exclusive contract for the machine with the Multigraph-Addressograph Company (hereinafter referred to as Multigraph-Addressograph), the company that manufactured the machine, however it agreed to release Multigraph-Addressograph from the exclusive contract for Bankers' limited purposes since it was not competitive. On February 11, 1939, Bankers and Granite Trust executed a contract which permitted the latter company to use Bankers' Special Service Checking Plan for a period of 3 years. *30 Bankers agreed to furnish Granite Trust with a printing press, checks, deposit tickets, passbooks, ledger cards, advertising materials, and many other items necessary to operate the system. Granite Trust agreed to pay Bankers $1.50 for the first book of 20 checks sold when an account was opened, and 20 cents for each additional book of 20 checks ordered by a depositor. Bankers installed its Special Service Checking Plan at Granite Trust on May 1, 1939, using a machine rented from the paper manufacturer, at which time it was negotiating with Multigraph-Addressograph for the purchase of similar machines. In June 1939, Bankers agreed to purchase 50 such machines (10 per year for 5 years) from Multigraph-Addressograph at a cost of approximately $136 per machine. Shortly thereafter Bankers changed the name of its special service checking plan to ThriftiCheck. The ThriftiCheck system was installed and operated under contracts with customer banks. Generally the contracts were similar to the one which Bankers executed with Granite Trust. Many of the contracts were for 5-year periods and were automatically extended for additional 5-year periods unless proper notice of termination was given *31 by one of the parties. Such contracts usually provided that the customer banks could discontinue the operation on any anniversary date after the second, without penalty, if they gave Bankers at least 6 months written notice. The following schedule shows the number of ThriftiCheck accounts installed and cancelled during each of the years ended April 30, 1940 through 1950, and the total number of ThriftiCheck accounts in operation at the end of each of those years: Thrifti-AccountsCheckCan-Accounts inYear EndedInstalledcelledOperation4-30-405054-30-41140194-30-42130324-30-43150474-30-44130604-30-45290894-30-461201014-30-472801294-30-482301524-30-492041684-30-50108170During the taxable years involved here, some of the automatic renewal periods of contracts had run out, and of these some had been renewed by express agreement, while others were continued without explicit undertaking on the part of either the customer bank or Bankers and were dealt with by Bankers as if renewed automatically for a further term. Still other contracts had been terminated at the end of the original term and were being carried on a month-to-month basis by express agreement. All the contracts in force at the *32 end of each of the taxable years involved here were terminable at the customer bank's option on notices varying from 1 to 12 months in length (6 months for the most part) if the contracts had been in effect for periods varying in length from 1 month to 3 years. Bankers has derived in excess of 90 per cent of its annual income since at least 1943, from its operation of the ThriftiCheck system. All expenses incurred by Bankers in operating the ThriftiCheck system, including the cost and upkeep of imprinting machines, were charged directly against current earnings. Casey and all of Bankers' salesmen were paid on a straight commission basis during the taxable years. The salesmen were not paid their commissions until the income was received by Bankers. At April 30, 1943, Bankers had 47 contracts in operation. The 50 machines ordered in 1939 were almost all in use. As new accounts were opened, Bankers supplied them with rebuilt machines, new ones not being available due to the shortage of materials caused by World War II. During 1944 Bankers considered the desirability of obtaining an imprinter which would be power operated and would contain an automatic feeding device. Multigraph-Addressograph *33 however would not consider building such an imprinter for Bankers. Bankers therefore made efforts to contact various concerns and individuals who might be in a position to develop such an imprinter. Meantime Bankers needed additional machines and it ordered 50 more from Multigraph-Addressograph at a total cost of $11,188 ($223.76 per machine). Bankers attempted to borrow from a bank in order to finance the purchase, but the bank would not make the loan unless Casey and Owen endorsed the note. No bank loan was made by Bankers at that time. In 1946, a man named Riley built a model imprinter for Bankers. It was power operated, had an automatic feed, and used a name tube. The name tube was a device for permanently setting a depositor's name in type so that it could be used repeatedly, thus avoiding the time consuming task of resetting a depositor's name each time he reordered checks. Riley formed the Ball Square Corporation (hereinafter referred to as Ball Square) to manufacture similar imprinters. However, due to internal difficulties Ball Square was not able to undertake manufacture of the imprinters. Bankers paid Riley for the development work and turned the model over to the Matheson *34 Machine & Tool Company (hereinafter referred to as the Matheson Company) for further development and production. During the early part of 1948 the Matheson Company delivered 12 of the automatic imprinters to Ball Square. That corporation then shipped the imprinters to banks according to instructions given it by Bankers. The imprinters proved unsatisfactory and continuing efforts were made by Bankers to locate a satisfactory imprinter. Bankers received estimates of anywhere from $150 to $1,000 each for the manufacturing of imprinters. Meantime Bankers needed more imprinters and it ordered an additional 25 "improved" automatic imprinters from the Matheson Company. About that time the ThriftiMatic Corporation (hereinafter referred to as ThriftiMatic) was incorporated. It had a capital structure of $10,000, which was contributed equally by its four stockholders: Casey, Owen, Pace and John Virgin, who was one of Bankers' chief salesmen. ThriftiMatic was formed for the purpose of procuring an imprinter which would meet the standards required by Bankers. Upon securing an imprinter ThriftiMatic was to furnish it to Bankers as well as other firms which needed such imprinters. In the fall of *35 1948 a competitor of Bankers displayed an automatic imprinter at the American Bankers Association Convention which proved quite satisfactory in operation. Commencing at that point and covering a period up to March 30, 1950, Bankers lost at least 8 customer banks due to competition from the above-mentioned firm. During this same period Bankers lost several other customer banks due to reasons such as a merger causing a change in personnel or where the dominant merged bank had either its own plan or some plan other than Bankers. In early 1949 Bankers entered into an agreement with a firm called Seal-O-Matic, whereby that firm agreed to develop an imprinter for Bankers and furnish it with 6 models, which Bankers planned to unveil at the American Bankers Association Convention to be held in October 1949. At the convention the display proved successful, though some defects were discovered while operating the imprinters. Subsequent to the convention Bankers negotiated with Seal-O-Matic for improvement and production of the imprinters. Seal-O-Matic's terms for perfecting and producing the imprinters however were unreasonable (in the opinion of Bankers) and negotiations between the parties *36 ceased. Seal-O-Matic was paid $6,000 for its services. Seal-O-Matic's engineer resigned from that company and offered, if financed, to perfect and produce the imprinter which Seal-O-Matic had built for Bankers. Casey estimated that it would take about $180,000 to produce and install 300 of those imprinters. ThriftiMatic did not have the means of financing such production and although Bankers had the means of financing, Owen was definitely not interested in financing the construction of the imprinters. In fact, Owen, as early as 1948, wanted to liquidate Bankers, and in lieu thereof, in several years, he was in favor of paying dividends. Casey persuaded Owen to allow Bankers to lend $50,000 to ThriftiMatic to help that company finance the production of imprinters. The loan was made on April 27, 1950, and on that date Bankers and ThriftiMatic executed a rental agreement. The agreement provided that ThriftiMatic would deliver 150 imprinters to Bankers within 90 days, which Bankers agreed to rent for a period of 2 years at $400 per month per imprinter. ThriftiMatic also agreed that it would not deliver imprinters to any other customers until Bankers' initial requirement was met, which *37 was estimated to be an additional 150 imprinters. ThriftiMatic loaned the above-mentioned $50,000 to the C & M Engineering & Manufacturing Company (hereinafter referred to as C & M), a corporation which had been formed for the purpose of manufacturing the imprinters. Subsequently ThriftiMatic loaned an additional $25,000 to C & M. Further financing of C & M was done by Casey to the extent of about $50,000 or $60,000. C & M manufactured only about 130 imprinters instead of the 150 originally ordered. Between April 30, 1950 and April 30, 1952, ThriftiMatic paid C & M and others $108,807.75 for 128 imprinters ( $425 each), 232 name tube locking machines ($52.79 each), and all other accessory items acquired during that period. ThriftiMatic delivered the imprinters to Bankers and that company in turn credited the rental of $400 per imprinter per year against the $50,000 loan balance until it was repaid in full in that manner. During 1951 Casey bought Owen's stock in Bankers and became the sole stockholder of that corporation. The imprinters manufactured by C & M proved unsatisfactory in operation and Bankers commenced looking for another source of imprinters. During the summer of 1951 Bankers *38 discovered a manufacturer of imprinters in West Virginia. A trial order was placed and deliveries were made to Bankers in May 1952, for field testing. The imprinters proved successful. ThriftiMatic started purchasing the imprinters in quantity in March 1953. The cost of the imprinters was $350 with an automatic feed, and $300 without it. ThriftiMatic in turn leased the imprinters to Bankers. On January 15, 1952, C & M submitted a bill to ThriftiMatic in the amount of $99,200 as its charge for cancellation of a contract for 300 imprinters. C & M was dissolved in 1952. On April 30, 1953, Casey dissolved Bankers and sold the business to the ThriftiCheck Service Corporation. Bankers' gross sales and net income after taxes as shown on its books and records for the years ended April 30, 1939, through April 30, 1951, and its surplus as shown on its books and records at the end of those years, were as follows: Net IncomeYear EndedGross SalesAfter TaxesSurplus4-30-39$ 84,871.35[3,903.36) *[41,487.02) **4-30-4077,713.962,956.27(34,853.87)4-30-4171,447.96(1,298.23)(37,023.61)4-30-4275,422.973,203.87(32,425.23)4-30-4382,172.2910,123.98(25,952.72)4-30-44113,908.8313,106.65(12,846.17)4-30-45149,324.3610,126.10(2,067.97)4-30-46176,778.8015,833.4520,582.264-30-47261,879.6017,856.3933,576.534-30-48275,616.5124,415.6261,793.864-30-49336,838.4537,647.37119,654.524-30-50388,716.3459,681.30146,657.874-30-51462,349.9634,829.67181,526.31*39 During the years ended April 30, 1948 through April 30, 1950, Bankers had profits from miscellaneous sales in the following amounts: Profit fromYear EndedMiscellaneous Sales4-30-48$1,538.554-30-493,938.504-30-501,697.95 Such profits were derived from sales of Lucite Signs, Coinmaster Banks, Beeline Calculators, Walpole Calculators, Interleaf Messages, and Duratex Covers. In 1940 Brian T. Moran was employed by Bankers as a salesman and remained so until his death in 1945. He worked solely on a commission basis. After Moran's death, his estate claimed commissions were due him so long as contracts secured by him were in existence. Litigation arose between the estate and Bankers concerning the claim for commissions. Such litigation was terminated in Bankers' favor, in the Court of Appeals for the State of New York, in 1954. As of April 30, 1947, Bankers had accrued as a contingent liability due to Moran's estate, the sum of $8,013.39. On its income tax returns for the years ended April 30, 1948 through April 30, 1950, Bankers claimed deductions for a contingent liability due to Moran's estate, as follows: Deduction Claimed forYear EndedContingent Liability4-30-48$11,547.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,484.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,778.83*40 The Commissioner disallowed such deductions and Casey, as transferee of Bankers, agreed to the disallowances (as well as to other minor adjustments to Bankers' returns), and income tax deficiencies attributable to the disallowances and adjustments were paid as follows: Income TaxYear EndedDeficiency Paid4-30-48$5,944.454-30-494,218.474-30-504,646.13For the taxable years ended April 30, 1948 through April 30, 1950, Bankers was entitled to and was allowed deductions, in addition to those claimed on its tax returns, for New York State franchise taxes, in the respective amounts of $332, $1,383.75 and $40.02. Bankers' net income, Federal income taxes, and net income after taxes, for each of the taxable years ended April 30, 1948 through April 30, 1950, as shown on Bankers' income tax returns, after correction for the erroneous deduction of the contingent liability for Moran commissions and allowance of additional New York State franchise taxes, were as follows: Year Ended4-30-484-30-494-30-50Net income$47,228.32$99,291.14$106,225.28Federal incometaxes17,148.0837,051.2339,415.90Net incomeafter taxes$30,080.24$62,239.91$ 66,809.38 During the taxable year ended April 30, 1949, Bankers paid *41 a net Federal tax deficiency for the taxable year ended April 30, 1946, in the amount of $1,779.52. In computing the deficiency for that year Bankers was allowed an additional deduction for New York State franchise taxes in the amount of $112.79. Bankers' Balance Sheets at the end of the years April 30, 1947 through April 30, 1950, as shown on its income tax returns (after separating the reserve for contingent liability to Moran's estate from accounts payable, and adding, as a liability, accrued Federal income taxes) were as follows: ASSETS4/30/474/30/484/30/494/30/50Cash$ 49,475.10$ 70,262.60$ 82,527.63$ 82,429.71Notes and Accts. Rec.20,183.7524,082.4036,787.4246,209.74Inventories6,078.488,117.8410,123.567,084.72Investments (including Savings and LoanA/Cs)30,233.1954,293.6169,234.2180,596.98Furn. and Fixt. (less Deprec.)6,678.407,559.578,985.727,462.69Goodwill (including unoperated portion ofsigned contracts)26,641.6026,641.6026,641.6021,641.60Other Assets447.28541.67311.95701.14Loans Rec. from affiliated Company50,000.00Total$139,737.80$191,499.29$234,612.09$301,126.58LIABILITIES AND CAPITALAccts. Pay. and Due Salesmen$ 52,584.48$ 63,418.88$ 35,455.18$ 24,847.42Accrued Taxes1,189.451,613.771,594.634,999.62Accrued Fed. Income Taxes7,782.3011,203.6332,832.7634,769.77Deposits on Machines737.501,487.501,487.50Res. for Salesmen's Doubtful Accounts573.95573.95573.95573.95Contingent Liability to Moran's Estate8,013.3919,561.3332,046.3143,825.14Capital Stock43,800.0043,800.0043,800.0043,800.00Earned Surplus25,794.2350,590.2386,821.76146,823.18Total$139,737.80$191,499.29$234,612.09$301,126.58*42 The liquid assets of Bankers, its current liabilities * , and the excess of liquid assets over current liabilities for each of the years ended April 30, 1947 through April 30, 1950, were as follows: 4/30/474/30/484/30/494/30/50Cash$49,475.10$ 70,262.60$ 82,527.63$ 82,429.71Investments (including Sav-ings and Loan A/Cs)30,233.1954,293.6169,234.2180,596.98Loans Receivable59,534.10Total Liquid Assets$79,708.29$124,556.21$151,761.84$222,560.79Current Liabilities61,556.2376,973.7871,370.0266,104.31Excess of Liquid Assets$18,152.06$ 47,582.43$ 80,391.82$156,456.48As of April 30, 1947, 1948, 1949 and 1950, Bankers had on deposit in various Federal Savings & Loan Associations, and owned stocks of other corporations acquired at cost, as follows: 4/30/474/30/484/30/494/30/50Federal Savings and Loan A/Cs$25,608.19$26,181.11$25,000.00$25,564.91Stock of other Corpns.4,625.0028,112.5044,234.2155,032.07$30,233.19$54,293.61$69,234.21$80,596.98 The deposits were maintained *43 in Savings & Loan Associations which were customers of Bankers. Bankers would have withdrawn the funds from them without hesitancy if it were necessary to do so for the normal operation of its business. None of the corporations whose stocks were held by Bankers was engaged in a business similar to Bankers. Bankers' Board of Directors held a meeting on April 18, 1949. The following excerpts are taken from the minutes of that meeting: "The board then proceeded to consider the advisability of the declaration of a dividend to be paid out of the earnings of the company for the corporation's fiscal year ended April 30, 1949. It was called to the attention of the Board that the check imprinting machines now in the possession of the corporation's client banks are of an old and outmoded design and within the near future, and very probably within the next year, it will be necessary for the corporation to replace these machines with a new and improved model which is now being developed for this company. It is estimated that approximately 207 of these new machines will be required, involving an estimated expense to the company of $70,000. "After carefully reviewing the financial condition of the *44 company and the results of its operation for the present fiscal year, the Board was of the opinion there were funds available for the payment of a dividend upon the company's capital stock of $10 per share and upon motion duly made, seconded and unanimously carried, it was thereupon resolved thereby and hereby is declared a divided $10of per share on the company's capital stock payable in cash on April 28, 1949 to stockholders of record at the close of the business on April 26, 1949." The total amount paid as a result of the dividend declared at the above mentioned meeting was $17,520. This was the only dividend paid by Bankers from the time of its incorporation through the taxable years involved herein. The additional income taxes due and payable by Casey for each of his taxable years 1948 through 1950, had the excess of Bankers' net income over Federal taxes for the respective years been distributed 50 per cent to him and 50 per cent to Owen, would have been as follows: AdditionalYearIncome Taxes1948$ 5,477.98194911,169.10195019,703.51Total$36,350.59Bankers did not permit its earnings or profits to accumulate beyond the reasonable needs of its business and was not availed of for *45 the purpose of preventing the imposition of surtax upon its shareholders during the taxable years ended April 30, 1948 and April 30, 1949. Bankers did permit its earnings or profits to accumulate beyond the reasonable needs of its business and was availed of for the purpose of preventing the imposition of surtax upon its shareholders during the taxable year ended April 30, 1950. Opinion The only issue for decision is whether the petitioner, a conceded transferee of Bankers, is liable for surtax determined under section 102. We must decide whether Bankers was availed of for the purpose of preventing the imposition of the surtax upon its shareholders through the medium of permitting its earnings and profits to be accumulated instead of being distributed, within the meaning of section 102(a). Section 102(c) provides that the fact that the earnings or profits of a corporation were permitted to accumulate beyond the reasonable needs of the business shall be determinative of the purpose to avoid surtax upon the shareholders unless the corporation by the clear preponderance of the evidence shall prove to the contrary. What the reasonable needs of a business are is a question of fact which *46 must be determined from the evidence as a whole. Helvering v. Chicago Stock Yards Co., 318 U.S. 693 (1943). In determining whether accumulations of earnings or profits in a particular year are within the reasonable needs of a corporation, it is necessary to consider prior accumulations, since such accumulations may have been sufficient to cover the corporation's needs and additional accumulations during the year involved would therefore not be reasonably necessary. See Gus Blass Co., 9 T.C. 15 (1947). However, if the accumulated earnings tax is to apply, the corporation must have funds or other property available during the taxable years which it can divide or distribute to its stockholders as a dividend. Sauk Investment Co., 34 B.T.A. 732 (1936). In so far as this latter requirement is concerned, it is sufficient to call attention to the fact that Bankers had liquid assets in excess of current liabilities in the respective amounts of $47,582.43, $80,391.82, and $156,456.48, at April 30, 1948, April 30, 1949, and April 30, 1950. The parties disagree as to the amount of Bankers' earnings and profits at the end of each of the taxable years. The Commissioner contends that Bankers' *47 earnings and profits were $70,151.56 at April 30, 1948, $118,868.07 at April 30, 1949, and $190,648.32 at April 30, 1950. The petitioner contends that adjustments should be made to those figures to take into account Federal income tax and New York franchise tax deficiencies applicable to the taxable years or prior years which were paid during the taxable years or in subsequent years. The petitioner also contends that adjustments should be made for the contingent liability for commissions to Moran's estate. The following schedule shows earnings and profits as computed by the Commissioner, adjustments made by the petitioner, and earnings and profits as computed by the petitioner: Earnings and Profits at4-30-484-30-494-30-50Bankers' earnings and profits as computedby the Commissioner$70,151.56$118,868.07$190,648.32Less, adjustment for Federal income taxand New York franchise tax deficiencies8,168.7611,991.4616,677.61$61,982.80$106,876.61$173,970.71Less, adjustment for contingent liabilityfor commissions to Moran's estate19,561.3332,046.3143,825.14Bankers' earnings and profits as computedby the petitioner$42,421.47$ 74,830.30$130,145.57We agree with the petitioner that Bankers' earnings *48 and profits should be reduced by the Federal income tax and New York franchise tax deficiencies which are applicable to the taxable years or prior years. Corporate Investment Co., 40 B.T.A. 1156, 1173 (1939). However, we think it is clear that Bankers' earnings and profits should not be reduced by the contingent liabilities for commissions to Moran's estate since Bankers disputed its liability and, in fact, in 1954 it was determined in a legal proceeding that Bankers was not liable for commissions to Moran's estate which accrued subsequent to Moran's death. See Paulina duPont Dean, 9 T.C. 256 (1947). This is not to say that an accumulation of earnings and profits for the purpose of providing a reserve for contingent liabilities to Moran's estate is not within the reasonable needs of Bankers' business. That is a different question and is discussed infra. We hold that Bankers had accumulated earnings and profits at April 30, 1948, April 30, 1949, and April 30, 1950, in the respective amounts of $61,982.80, $106,876.61, and $173,970.71. Bankers' principal service was providing banks with all the equipment and materials necessary for operating no minimum balance checking accounts - *49 the ThriftiCheck system. It was not until after the taxable years that Bankers obtained a check imprinter which would operate satisfactorily. Nevertheless, its business increased steadily throughout the years. However, the record indicates that the degree of Bankers' ultimate success hinged to some extent upon the quality of the check imprinter furnished the banks. The petitioner's main contention is that the earnings and profits of Bankers were permitted to accumulate for the purpose of enabling Bankers to acquire check imprinters which would meet its requirements, thus making it possible for Bankers adequately to promote its banking service. The record indicates that up to about 1949 or 1950 it was Bankers' policy to purchase imprinters as it needed them with funds derived from current operating revenues. The costs of the imprinters were written off in the year of purchase as normal operating expenses. Evidently Owen was in favor of continuing this policy. On the other hand, it appears that Casey was in favor of replacing all of its hand operated imprinters with automatic imprinters as soon as it could find an automatic imprinter which would meet its requirements. In 1949 Bankers *50 estimated that it would require about $70,000 to replace approximately 200 imprinters and later petitioner estimated that it would cost about $180,000 to acquire and install $300 new automatic imprinters. However it is clear from the petitioner's own testimony that Owen would not allow Bankers to undertake any such mass imprinter replacement program. The petitioner testified that as early as 1948 Owen was in favor of liquidating Bankers or if not liquidated, he was in favor of its distributing some dividends. He also testified that Owen was strongly opposed to using Bankers' funds to replace its hand operated imprinters with automatic imprinters though in 1950 he finally agreed to allow Bankers to lend a maximum of $50,000 to ThriftiMatic to help that company procure the type of imprinter which Bankers needed in order to keep abreast with its competitors. An accumulation of earnings for the purpose of replacing equipment may be reasonable under certain conditions. Newman Machine Co., 26 T.C. 1030 (1956). One of those conditions is the likelihood that the equipment replacement will actually occur. See KOMA, Inc. v. Commissioner, 189 Fed. (2d) 390 (C.A. 10, 1951), affirming a memorandum *51 opinion of this Court [8 TCM 1064,], and Bride v. Commissioner, 224 Fed. (2d) 39 (C.A. 8, 1955), affirming a memorandum opinion of this Court [12 TCM 1230]. Owen was strongly opposed to Bankers' using any of its funds for such purpose and since he was a 50 per cent stockholder he had the power to enforce his convictions. However, in April of 1950, Owen finally consented to allow Bankers to lend $50,000 to ThriftiMatic on the condition that ThriftiMatic would procure imprinters, rent them to Bankers, and credit the rentals against the loan. We think the record clearly establishes that Owen would not allow Bankers to expend funds in excess of $50,000, other than funds derived from current operating revenues, in replacing its hand operated imprinters. Furthermore, it appears that no more than that amount would be needed since funds derived from Bankers' steadily increasing current earnings (in spite of increased competition) would provide substantial funds for replacing imprinters. In view of these circumstances and considering the record as a whole, it is our opinion that during the taxable years any accumulations of earnings by Bankers in excess of $50,000, for the purpose of replacing *52 imprinters, were beyond its reasonable needs for such purpose. In 1948, Moran's estate instituted litigation claiming commissions were due Moran so long as contracts secured by him were in existence, and it was not until 1954 that such litigation was terminated in Bankers' favor in the Court of Appeals for the State of New York. The outcome of the litigation was, of course, uncertain during the taxable years. It is our opinion that Bankers' accumulation of surplus during the taxable years to the extent of the liability it might reasonably expect to suffer under the pending lawsuit ($19,561.33 at April 30, 1948; $32,046.31 at April 30, 1949; and $43,825.14 at April 30, 1950), was within the reasonable needs of its business. See William C. Atwater & Co., 10 T.C. 218 (1948). We conclude that an accumulation of earnings in the amount of $69,561.33 for the purpose of replacing imprinters and providing a reserve for pending litigation was within the reasonable needs of Bankers' business as of April 30, 1948. Since Bankers' earnings and profits at that date were less than that amount, it is clear that the accumulation of earnings and profits by Bankers during the year ended April 30, 1948, *53 were not beyond the reasonable needs of its business and that Bankers was not availed of for purposes of avoiding the surtax upon its shareholders within the meaning of section 102. At April 30, 1949, Bankers' earnings and profits were $106,876.61. We conclude that an accumulation of earnings in the amount of $82,046.31 for the purpose of replacing imprinters and providing a reserve for pending litigation was within the reasonable needs of Bankers' business as of April 30, 1949. Thus Bankers' earnings and profits exceed its reasonable needs for the above purposes by $24,830.30. However, the petitioner argues that in determining whether Bankers improperly accumulated earnings, we should take into consideration the fact that "Unoperated Portion of Signed Contracts" carried on Bankers' books at a value of $26,640.60 was in fact an asset which had no value whatsoever. We think there is merit in the petitioner's argument. Depreciation in the value of any of Bankers' assets is evidence to be considered in determining whether the accumulation of earnings was in excess of the reasonable needs of the business. Helvering v. Nat. Grocery Co., 304 U.S. 282 (1938). When Bankers was incorporated *54 in 1920 it exchanged stock for personal solicitation contracts and recorded them on its books at the above mentioned value of $26,640.60. Such contracts resembled wasting assets. As the years passed the contracts decreased in value. This is evident from the fact that until 1939 solicitation contracts produced most of Bankers' income, but since 1943 they have produced less than 10 per cent of its income, and many, if not all, of the original solicitation contracts were not in existence during the taxable years. In view of these circumstances we think the value of the solicitation contracts, if any, is negligible. When the book value of the solicitation contracts is written off, or written down, by Bankers, there will be a consequent reduction in accumulated earnings and profits. It is our opinion, therefore, that to accumulate earnings and profits to offset the decrease in value of the asset denominated "Unoperated Portion of Signed Contracts" was within the reasonable needs of Bankers' business. C. H. Spitzner & Son, Inc., 37 B.T.A. 511 (1938). Accordingly, we conclude that the accumulations of earnings or profits by Bankers during the year ended April 30, 1949, were not beyond the *55 reasonable needs of its business and that Bankers was not availed of for purposes of avoiding the surtax upon its shareholders within the meaning of section 102 during that year. Bankers' accumulated earnings and profits at April 30, 1950, totalled $173,970.71. It is apparent from our discussion above that it was within Bankers' reasonable needs to accumulate earnings and profits in the amount of $120,465.74 for the purpose of replacing imprinters, providing a reserve for pending litigation, and providing for the eventual decrease in accumulated earnings and profits which would result from writing off, or writing down, the value of the asset denominated "Unoperated Portion of Signed Contracts." Thus Bankers' earnings and profits exceed its reasonable needs for the above purposes by $53,504.97. Petitioner makes the argument that Bankers needed accumulations of earnings so that it could diversify its services and thus protect itself from sudden disaster should it become unable to successfully operate the ThriftiCheck system. Petitioner does not indicate the manner in which Bankers intended to diversity its services. It is clear to us from examining the record as a whole, that any intentions *56 which Bankers had for diversifying its services were indefinite and nebulous. Under such circumstances the accumulations are not within the reasonable needs of the business. See Bride v. Commissioner, supra. Petitioner tries to establish that Bankers' competitors, using superior imprinters, could cause Bankers' sales income to decline sharply, which provides another reason for accumulating earnings. It was stipulated that Bankers lost at least 8 customer banks during the years ended April 30, 1949, and April 30, 1950, due to competition from a firm with a satisfactory automatic imprinter. However, we think it is perfectly clear from the record that Bankers was not in any danger of losing most of its customers within a short period of time as the petitioner would have us believe. For example, at the beginning of the year ended April 30, 1949, Bankers had 152 accounts in operation. During that year it acquired 20 new accounts, but had 4 accounts cancelled, resulting in an overall gain of 16 accounts. During the year ended April 30, 1950, Bankers acquired 10 new accounts, but had 8 accounts cancelled. Even so, Bankers had more accounts in operation at the end of the year than at the *57 beginning. Furthermore, Bankers' gross sales in the year ended April 30, 1949, were $336,838.45 and its net income after taxes was $37,647.37. Both amounts were much higher than those of any other prior year in which Bankers was operating the ThriftiCheck system. And in the year ended April 30, 1950, a year when Bankers was being pushed hard by competitors, its gross sales and net income after taxes both rose substantially higher than in the prior year, i.e. gross sales were $388,716.34 and net income after taxes was $59,681.30. Petitioner's contention that Bankers was in danger of losing most of its customers during the taxable years which would cause its sales income to decline sharply, is so remote that it can not constitute a reasonable need for accumulating earnings and profits. In our opinion, the record considered as a whole warrants the conclusion that Bankers permitted its earnings and profits to accumulate beyond the reasonable needs of its business during the taxable year ended April 30, 1950. Since our conclusion rests on a consideration of the record as a whole, it is unnecessary for us to determine under section 534 of the Internal Revenue Code of 1954 where the burden *58 of proving business necessity lies. Our conclusion that Bankers permitted its earnings and profits to accumulate beyond the reasonable needs of its business during the taxable year ended April 30, 1950, establishes the presumption, under section 102(c), that it was the purpose of Bankers to avoid surtax upon its shareholders for that year. It is provided, however, under further provisions of section 102(c), that the presumption can be overcome by a clear preponderance of the evidence to the contrary. The petitioner testified that his personal income tax bracket had nothing to do with his decisions about declaring dividends. Nevertheless he intimated that he was aware of the tax consequences which would have resulted had Bankers distributed its earnings and it is stipulated that had Bankers distributed its net income after taxes for the year ended April 30, 1950, petitioner would have paid additional income tax in the amount of $19,703.51, in that year. We note that the only minutes of Directors' Meetings introduced into evidence were those quoted in our Findings of Fact pertaining to the dividend declared on April 18, 1949. Thus there is very little in the record in the way of formal *59 manifestations of the intentions of Bankers' Board of Directors in accumulating its earnings and profits. After considering the record as a whole, we think that the petitioner has failed to overcome, by a clear preponderance of the evidence to the contrary, the presumption established under section 102(c) that Bankers was availed of for the purpose of preventing the imposition of surtax upon its shareholders for the year ended April 30, 1950, and accordingly we approve the imposition of the surtax on Bankers under section 102. Decision will be entered under Rule 50. Footnotes**. Loss.↩*. The number of personal solicitation contracts are not separately identifiable from other sources of income shown on Bankers' Balance Sheets or operating statements for these years. ↩*. Loss ↩**. Deficit↩*. Current Liabilities is computed without including the contingent liability to Moran's estate for commissions, and without including the additional tax liabilities which arose from the disallowance of the Moran commissions as a deduction.↩